Case 3:22-cv-00390   Document 79   Filed on 02/08/23 in TXSD   Page 1 of 15

United States District Court
Southern District of Texas
**ENTERED**
February 08, 2023
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | | |
|---|---|---|
| MAERSK TANKERS MR K/S, | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 3:22-cv-00390 |
| | § | |
| M/T SWIFT WINCHESTER, *in rem*, *et al.*, | § | |
| | § | |
| | § | |
| Defendants. | § | |

## <u>OPINION AND ORDER</u>[1]

Pending before me is a Motion to Disqualify Counsel, Strike Pleadings and Submit Documents to the Court *In Camera* filed by Defendant Winchester Shipping, Inc. ("Winchester").[2] *See* Dkt. 37. In that motion, Winchester seeks to disqualify the law firm of Schouest, Bamdas, Soshea, BenMaier & Eastham PLLC ("SBSB Eastham") from representing Plaintiff Maersk Tankers MR K/S ("Maersk") in this matter.[3] Maersk has responded (*see* Dkt. 39), Winchester has replied (*see* Dkt. 53), and Maersk has filed a sur-reply. *See* Dkt. 60. Both parties have also submitted documents to the court *in camera*. Having reviewed the parties' briefing, the *in camera* submissions, and the relevant law, I **GRANT** Winchester's motion to disqualify SBSB Eastham from representing Maersk in this matter. Winchester's motion to strike pleadings, however, is **DENIED**.

---

[1] "The cases are uniform in holding that a motion to disqualify counsel is a nondispositive matter" that a magistrate judge may decide. *Medgyesy v. Medgyesy*, 988 F. Supp. 2d 843, 845 n.1 (N.D. Ill. 2013) (collecting cases).

[2] Winchester has entered a restricted appearance pursuant to Supplemental Rule E(8).

[3] Winchester's briefing specifically mentions SBSB Eastham attorney Kelly M. Haas by name, though SBSB Eastham attorneys Robert L. Klawetter and James T. Bailey have also entered Notices of Appearance in this matter on behalf of Maersk. *See* Dkts. 22–23.

## BACKGROUND

This matter concerns the September 8, 2022 detention of the M/T SWIFT WINCHESTER ("the Vessel") by the U.S. Coast Guard ("USCG") in Port Arthur, Texas. Winchester is the owner of the Vessel[4] and had committed it to a commercial tanker trading pool known as the Maersk Tankers Pool Agreement ("the Pool Agreement") to which Maersk serves as the commercial manager and Winchester is a member. On September 1, 2022, Maersk chartered the Vessel to PMI Trading DAC ("PMI") under a charterparty ("the PMI Charter") that provided for the transport of clean petroleum products from Port Arthur, Texas to Mexico. When the USCG detained the Vessel in Port Arthur, Texas, on September 8, 2022, Winchester looked to its protection and indemnity club ("P&I Club"),[5] The Swedish Club ("the Club"), for civil counsel.[6] SBSB Eastham acknowledges that it "served as local correspondents at the direction of the Swedish P&I Club for the non-MARPOL issues related to the detention of the SWIFT WINCHESTER."[7] Dkt. 78-1 at 6.

On September 10, 2022, SBSB Eastham's Ms. Haas "attended onboard the M/T SWIFT WINCHESTER while it was detained in the Port of Beaumont by the USCG for a Port State Control Inspection." *Id.* at 1. "While onboard, Ms. Haas helped the Master as needed to ensure that the non-MARPOL related deficiencies were corrected and inspected by the class surveyor from Lloyd's Register that was also onboard." *Id.* at 2. Following the inspection, Ms. Haas sent a detailed report to the Club detailing who was aboard the Vessel, the contents of the inspection, an

---

[4] During the relevant time period, V.Ships Norway ("V.Ships") managed the Vessel.

[5] "Clubs function as insurance companies" for shipowners, where "[t]he members of the club share the cost of any claims. . . . Protection and indemnity (P&I) insurance covers the liability of the members." *Achille Lauro Lines, S.R.L. v. W. Indies Transp. Limitada, S.A.*, No. 00-11085, 2002 WL 31431559, at *2 n.3 (11th Cir. July 16, 2002).

[6] Winchester retained separate criminal counsel.

[7] Marine pollution ("MARPOL") violations are class D felonies, *see* 33 U.S.C. § 1908, that are excluded from the Club's coverage. *See* Dkt. 61-1 at 94.

itemized list of items taken into custody, and a request from the USCG for mirror image copies of certain hard drives. *See id.* at 2–3. On September 12, 2022, Ms. Haas provided legal advice to Winchester, the contents of which are under seal. *See* Dkt. 78-2 at 35. On September 13, 2022, SBSB Eastham received notice that Winchester had "engaged new counsel" in Blank Rome (Winchester's counsel of record in this litigation), with whom Ms. Haas "advised that she would coordinate" and "assist . . . as instructed." Dkt. 78-1 at 4. That same day, Ms. Haas "provided a final update" to the Club, including her impression of the investigation, the contents of which are under seal. *Id.* at 5. Ms. Haas also made certain recommendations, the contents of which are under seal. Dkt. 78-2 at 48. On September 14, 2022, Ms. Haas corresponded with Blank Rome regarding imaging certain hard drives. *See id.* at 55. Finally, according to the documents submitted by SBSB Eastman, Ms. Haas last corresponded with Blank Rome on November 1, 2022. *See id.* at 22.

      On November 3, 2022, Ms. Haas contacted my case manager to advise that she would likely be filing a Rule C complaint and moving for an order to seize a vessel over the weekend. *See* Dkt. 79-1 at 4–5. She requested the court's procedures for weekend filings. Ms. Haas contacted my case manager again on November 4 and 6, 2022 to advise as to the status of her filing, which had been delayed due to weather and the arrival of the vessel into the court's jurisdiction. *See id.* at 3–4. Ms. Haas did not specify her client or the vessel that would be the subject of such a complaint, but on November 8, 2022, Ms. Haas instituted the action at bar on behalf of Maersk against Winchester. Plaintiff's Verified Original Complaint, filed by Ms. Haas, states that "the Vessel was significantly delayed and/or failed to depart the United States due to . . . alleged marine pollution violations and related investigation by the U.S. Coast Guard and U.S. Department of Justice," and that "[b]y reason of the foregoing," PMI has placed Maersk on notice of claims "arising from . . . the delay to the Cargo caused by the alleged violation(s) . . . of the Vessel."

3

Dkt. 1 at 3–4. Ten days later, Winchester filed the instant motion to disqualify Ms. Haas and SBSB Eastham.

## LEGAL STANDARD

The Fifth Circuit has succinctly articulated the choice of law and applicable standards for considering a motion to disqualify:

> ### *1. Choice of Law*
> When considering motions to disqualify, courts should first look to the local rules promulgated by the local court itself. The Local Rules of the Southern District of Texas provide that "the minimum standard of practice shall be the Texas Disciplinary Rules of Professional Conduct" (Texas Rules), and that violations of the Texas Rules "shall be grounds for disciplinary action, but the court is not limited by that code." S.D. TEX. LOCAL R. APP. A, R. 1A & 1B. Therefore, the Texas Rules are not the sole authority governing a motion to disqualify. A reviewing court also considers the motion governed by the ethical rules announced by the national profession in light of the public interest and the litigants' rights. The Fifth Circuit has recognized the ABA Model Rules of Professional Conduct (Model Rules) as the national standards to consider in reviewing motions to disqualify. . . .
>
> ### *2. Applicable Standards*
> The Fifth Circuit's approach to ethical issues has remained sensitive to preventing conflicts of interest. Under this approach, a district court is obliged to take measures against unethical conduct occurring in connection with any proceeding before it. Yet, depriving a party of the right to be represented by the attorney of his or her choice is a penalty that must not be imposed without careful consideration. Because of the severity of disqualification, [courts should] not apply disqualification rules mechanically, but [should] consider all of the facts particular to the case . . . in the context of the relevant ethical criteria and with meticulous deference to the litigant's rights. Stated plainly, this sanction must not be imposed cavalierly.

*In re ProEducation Int'l, Inc.*, 587 F.3d 296, 299–300 (5th Cir. 2009) (cleaned up).

"There are two ways in which a former client may bar an attorney from representing an adverse[8] party. Disqualification can be justified: (1) if the subject

---

[8] There is no dispute that Winchester and Maersk are adverse in this matter.

4

matter of the present and former representation are substantially related, or (2) if movant's former attorney possessed relevant confidential information." *Abney v. Wal-Mart*, 984 F. Supp. 526, 528 (E.D. Tex. 1997) (cleaned up); *accord* TEX. DISC. R. PROF'L CONDUCT 1.09(a)(2)–(3) ("Without prior consent, a lawyer who personally has formerly represented a client in a matter shall not thereafter represent another person in a matter adverse to the former client . . . (2) if the representation in reasonable probability will involve a violation of rule 1.05[9]; or (3) if it is the same or a substantially related matter."). If "the former client proves that the subject matters of the present and prior representations are 'substantially related,' the court will irrebuttably presume that relevant confidential information was disclosed during the former period of representation." *Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 646 F.2d 1020, 1028 (5th Cir. 1981) (cleaned up).[10]

> Of "substantial relation," the Texas Supreme Court has said:
>
> The moving party must prove the existence of a prior attorney–client relationship in which the factual matters involved were so related to the facts in the pending litigation that it creates a genuine threat that confidences revealed to his former counsel will be divulged to his present adversary. Sustaining this burden requires evidence of specific similarities capable of being recited in the disqualification order. If this burden can be met, the moving party is entitled to a

---

[9] Rule 1.05 concerns what constitutes confidential information, including privileged and unprivileged confidential information; the requirement to maintain confidentiality; and the circumstances under which confidential information may be revealed. *Id.* at Rule 1.05.

[10] More recent Texas Supreme Court opinions have held that "If the lawyer works on a matter, there is an irrebuttable presumption that the lawyer obtained confidential information during representation." *In re Thetford*, 574 S.W.3d 362, 373 n.16 (Tex. 2019) (quoting *In re Columbia Valley Healthcare Sys., L.P.*, 320 S.W.3d 819, 824 (Tex. 2010)). "[T]he instant motion to disqualify is a substantive motion under federal law, and this Court, while it considers the Texas Rules and Texas case law as guidance, looks to Fifth Circuit precedent as controlling authority." *Nat'l Oilwell Varco, L.P. v. Omron Oilfield & Marine, Inc.*, 60 F. Supp. 3d 751, 760 n.4 (W.D. Tex. 2014). Nevertheless, regardless of whether the irrebuttable presumption applies as a function of representation, or upon the showing of a substantial relationship between the present and prior representations, Winchester must still establish a substantial relationship.

conclusive presumption that confidences and secrets were imparted to the former attorney.

*NCNB Tex. Nat. Bank v. Coker*, 765 S.W.2d 398, 400 (Tex. 1989) (citation omitted), *abrogated on other grounds by In re Thetford*, 574 S.W.3d at 373 n.16. With these principles in mind, I turn to the task at hand.

## ANALYSIS

### A. ATTORNEY–CLIENT RELATIONSHIP

For an attorney–client relationship to be established, "the parties must explicitly or by their conduct manifest an intention to create it. To determine whether there was a meeting of the minds, we use an objective standard examining what the parties said and did and do not look at their subjective states of mind." *Sutton v. Estate of McCormick*, 47 S.W.3d 179, 182 (Tex. App.—Corpus Christi–Edinburg 2001, no pet.). In Maersk's sur-reply, SBSB Eastham argues that its role as the Club's local correspondent was limited, and receipt of its local correspondent services does not constitute an attorney–client relationship. *See* Dkt. 60 at 2. I find this argument strained and unsupported.

The evidence of an attorney–client relationship is clear and unmistakable. To start, on September 9, 2022, Mr. Klawetter—an SBSB Eastham attorney who has appeared for Maersk in this litigation—"Confirmed" to a Claims Executive from The Swedish Club "that documentation sent by owners[11] directly to [SBSB Eastham] will be subject to privilege." Dkt. 66-1 at 105. Winchester was copied on this email, as was James Bailey, another SBSB Eastham attorney and counsel of record for Maersk in this litigation. *See id.* at 104. Accordingly, it is objectively reasonable for Winchester to believe that Mr. Klawetter's confirmation to the Club—that any documentation Winchester sent to SBSB Eastham directly would be subject to privilege—constituted an agreement with regard to representation, and thus established an attorney–client relationship. That SBSB Eastham sent Winchester an "invoice for services rendered that details the scope of attorney

---

[11] The Vessel's owner is Winchester.

6

services rendered" to Winchester only bolsters the objective reasonableness of Winchester's belief that it had an attorney–client relationship with SBSB Eastham. Dkt. 53 at 4 n.8. Furthermore, commonsense dictates that the only reason an attorney from a law firm would be on board during an inspection is to provide legal advice.

Given that the exchange regarding whether Winchester's communications to SBSB Eastham would be privileged included the Club, it is important to address the unique relationship between P&I Clubs, their members, and local correspondents. A P&I Club is "not a traditional insurance company." *Psarianos v. Standard Marine, Ltd.*, 728 F. Supp. 438, 451 (E.D. Tex. 1989). "[I]t is a group of shipowners who have agreed to insure one another's vessels for the mutual benefit of all. . . . [T]he coverage provided is indemnity, rather than liability. There is no duty to defend, although coverage does include reimbursement for defense costs." *Id.*

The Texas Supreme Court's decision in *Employers Casualty Co. v. Tilley*, 496 S.W.2d 552 (Tex. 1973), yielded a body of law regarding the "tripartite relationship among an insurer, defense counsel, and insured in the context of insurance defense litigation." *In re Sassin*, 511 S.W.3d 121, 126 (Tex. App.—El Paso 2014, no pet.) (citing *Tilley*, 496 S.W.2d at 558–59). "[S]uch attorney becomes the attorney of record and the legal representative of the insured, and as such he owes the insured the same type of unqualified loyalty as if he had been originally employed by the insured." *Tilley*, 496 S.W.2d at 558.

The *Psarianos* court summed up the facts of *Tilley* quite nicely:

> In *Tilley*, an insurance company hired an attorney to represent its policyholder, Joe Tilley, in a personal injury suit. In addition to defending Tilley, the attorney hired by the insurance company worked for nearly eighteen months to develop a late-notice policy defense for the insurance company. The attorney took statements from Tilley's employees, and sent evidence, information, and briefs to the insurance company at its request on the late-notice question. All this was done without Tilley's knowledge, at the request of the insurance

company, and was, under the prevailing Texas law, an ethically acceptable practice.

After this information was developed, the insurance company filed a declaratory judgment action against Tilley, seeking a determination that the late notice by the insured relieved it of any obligation to defend the personal injury suit. After reviewing the obligations owed by attorneys hired by insurance companies to defend named or additional insureds, the court concluded that the insurer was estopped from denying its responsibilities for the defense of Tilley.

*Psarianos*, 728 F. Supp. at 451 (citations omitted).

SBSB Eastham argues that because P&I Clubs do not function as traditional insurance companies, *Tilley* is inapplicable. For support, SBSB Eastham cites *Psarianos*—a case in which a district court found that local correspondents for a P&I Club had not violated *Tilley*. A close read shows that, rather than advancing SBSB Eastham's argument, *Psarianos* establishes that, through SBSB Eastham's role as local correspondent, it was acting as Winchester's counsel. In *Psarianos*, the vessel's owner filed a third party proceeding against its P&I Club, arguing that it breached its contract of insurance. The P&I Club moved to dismiss, claiming that it had the right to arbitrate the contract dispute in London. The vessel's owner argued that, under *Tilley*, the Club could not use arbitration as a defense because the Club had retained the law firm of Walker and Corsa to investigate both the issue of liability *and* the issue of coverage. The district court rejected this argument:

The vessel owner's potential liability and his ability to limit his liability were the only subject of Walker and Corsa's investigation.

. . . .

Here, Walker and Corsa first reported the findings of their investigation to the Club on February 6, 1984. A copy of this letter was sent by the Club to [the vessel owner] on the same day. On February 7, 1984, Walker and Corsa telexed a preliminary report to the Club. On February 9, 1984, the Club advised [the vessel owner] that it was reserving its position on coverage. Walker and Corsa's report of February 10, 1984, was sent to both [the vessel owner] and the Club. The deficiencies in the vessel's condition were reported by Walker and Corsa to Eagle and the Club on February 6, 1984, and February 10,

8

> 1984. At no time in any of its reports did Walker and Corsa address coverage, or even mention the Club's Rules relating to vessel classification. Their investigation concentrated on liability, not coverage.

*Id.* at 452. Most importantly, the district court concluded with the following: "If [the vessel owner] was uninsured, and it retained lawyers on its own to investigate this casualty, ***its lawyers would have done exactly as Walker and Corsa did***. *Id.* (emphasis added). In other words, the lawyers provided to the vessel owner by its P&I Club were just that—lawyers for the vessel owner.

*Psarianos* did not find that *Tilley* was inapplicable because P&I Clubs are not traditional insurers. *Psarianos* found that the attorneys for the P&I Club and its member had not violated *Tilley*, confirming that *Tilley* applies to the tripartite relationship between a P&I Club, its members, and its local correspondents, notwithstanding the fact that P&I Clubs are not traditional insurers, or that the involvement of local correspondents may be limited to mere days.[12] Accordingly, while SBSB Eastham may have been but one of several firms representing Winchester during the Vessel's detention, the fact remains that SBSB Eastham was Winchester's counsel for the short duration that it assisted Winchester during the Vessel's detention, and it owes Winchester unqualified loyalty.

Four pages into the analysis of whether Winchester has established an attorney–client relationship with SBSB Eastham, the turkey seems cooked. Nevertheless, because disqualification is a severe sanction, I will address SBSB Eastham's remaining arguments. Specifically, SBSB Eastham cites *Gabarick v. Laurin Maritime (America), Inc.*, No. 08-4007, 2011 WL 2838226, at *5 (E.D. La. July 15, 2011), for the proposition that "the attorney–client privilege attaches only

---

[12] Further evidence that the unique nature of P&I Clubs does not lessen the tripartite relationship is the fact that, in *Psarianos*, "the Club engaged separate counsel" after notifying the vessel's owner of a potential coverage problem. *Id.* "Walker and Corsa did not continue to represent either party." *Id.* That Walker and Corsa ceased representing the Club and its member upon learning of a coverage issue tracks the guidelines that the International Group of P&I Clubs issues to correspondents regarding conflicts of interest. *See* Dkt. 60-1 at 6.

9

to communications made for the purpose of giving or obtaining legal advice or services, not business or technical advice or management decisions."[13] Dkt. 60 at 2. SBSB Eastham similarly cites *Puerto Rico v. SS ZOE COLOCOTRONI*, 61 F.R.D. 653 (D.P.R. 1974), for the proposition that "communications in which the correspondent renders services that are non-legal in nature, such as making necessary arrangements for a crewman to be hospitalized or buried, engaging the services of a surveyor . . ., or arranging for the repatriation of seamen, would not be considered privileged." Dkt. 60 at 3. But contrary to SBSB Eastham's conclusory assertions otherwise, it did not give business or technical advice; nor did it make hospitalization, burial, or repatriation arrangements. Rather, SBSB Eastham[14] billed "The Owners of SWIFT WINCHESTER" for the following professional services rendered:

- "coordinate defense of Member";
- "Preparing Litigation Hold for Member";
- "assist coordinating company response to USCG inspection and investigation";
- "plan for continuing defense of allegations; responding to same";

---

[13] The full paragraph of the court's opinion makes clear that this statement is in reference to communications made to in-house counsel in a corporate setting. *See Gabarick*, 2011 WL 2838226, at *5 ("The attorney–client privilege applies in a corporate setting. However, because in-house counsel has an increased level of participation in the day-to-day operations of the corporation, it is more difficult to define the scope of the privilege when a communication is made to in-house counsel. Thus, in such a setting, the attorney–client privilege attaches only to communications made for the purpose of giving or obtaining legal advice or services, not business or technical advice or management decisions." (citation omitted)). The same is true for SBSB Eastham's citation to *North American Mortgage Investors v. First Wisconsin National Bank of Milwaukee*, 69 F.R.D. 9, 11 (E.D. Wis. 1975) (discussing whether the author of an allegedly privileged document was functioning as in-house counsel or a mortgage banking officer at the time of authorship).

[14] Although the invoice has the letterhead of Eastham, Watson, Dale & Forney, L.L.P., I take judicial notice of the fact that SBSB Eastham is the product of a recent merger between SBSB Law and Eastham, Watson, Dale & Forney. *See SBSB Law and Eastham Joining Forces to Create Legal Powerhouse: SBSB Eastham*, SCHOEUST, BAMDAS, SOSHEA, BENMAIER & EASTHAM PLLC (Mar. 8, 2022), https://sbsb-eastham.com/news-item/sbsb-law-and-eastham-joining-forces-to-create-legal-powerhouse-sbsb-eastham/.

- "Reviewing USCG demand for security and assist with preparing recommendations to Club/Member and responding to USCG";
- "review correspondence from [criminal counsel] re bond for vessel release";
- conferring internally "re bond issues and recommendation to [criminal counsel]

Dkt. 66-1 at 136–140. SBSB Eastham makes no attempt to explain how these are not legal services squarely within the role of an attorney. Moreover, the fact that SBSB Eastham undertook these activities and billed Winchester for them only bolsters the objective reasonableness of Winchester's belief that it had an attorney–client relationship with SBSB Eastham.

To appreciate just how far SBSB Eastham is reaching with its contention that it had no attorney–client relationship with Winchester, one need only look to the fifth paragraph of Maersk's sur-reply:

> The Swedish P&I Club identifies two local correspondents for the Houston area in its 2022 List of Correspondents: (1) [IMC]; and (2) SBSB Eastham. According to IMC's website, it provides a wide range of survey, technical, claims handling, regulatory compliance and legal consulting services . . . . Even though legal consulting services are provided by IMC, they expressly state on their website that "receipt of services provided by it and Patrick Lennon (a licensed attorney in New York and Connecticut) does not constitute an attorney–client relationship." Similarly, receipt of local correspondent services from SBSB Eastham and Ms. Haas does not constitute an attorney–client relationship.

Dkt. 60 at 3–4 (citations omitted). What is missing from this paragraph speaks volumes. SBSB Eastham does not cite to such a disclaimer on its own website. The best support SBSB Eastham can muster for why it did not establish an attorney–client relationship with Winchester is to point to a disclaimer from the website of a consulting firm that just happens to employ an attorney. But the fact that a consulting firm—one of only two local correspondents for the Club in Houston—has such a disclaimer while the other, the law firm of SBSB Eastham, does not, works against SBSB Eastham. To the extent a "disclaimer is an obvious attempt to avoid an inadvertent creation of [an attorney–client] relationship," *Banc One Cap.*

11

*Partners Corp. v. Kneipper*, 67 F.3d 1187, 1199 (5th Cir. 1995), it is telling that SBSB Eastham has not produced its *own* disclaimer with similar language.[15] Accordingly, I find that Winchester has established that it had an attorney–client relationship with SBSB Eastham during the Vessel's September 2022 detention in Port Arthur.

## B. SUBSTANTIAL RELATIONSHIP

Proving a substantial relationship between the present and former representation "requires evidence of specific similarities capable of being recited in the disqualification order." *Coker*, 765 S.W.2d at 400. Winchester argues that it seeks to disqualify SBSB Eastham because the firm "previously represented [Winchester] in connection with a specific occurrence in September 2022 (i.e., the detention of the Vessel by the U.S. Coast Guard), [and] that same counsel now presses claims against [Winchester] related to that same detention and resulting delays to the Vessel's sailing schedule in September 2022." Dkt. 53 at 8. Winchester argues that this is more than a superficial resemblance. I agree.

The verified complaint that SBSB Eastham filed on behalf of Maersk on November 8, 2022—less than two months after attending the USCG investigation aboard the Vessel on behalf of the Club and Winchester—states that "the Vessel was significantly delayed . . . due to various reasons including . . . (i) alleged marine pollution violations and related investigation by the U.S. Coast Guard and

---

[15] To be fair, SBSB Eastham's public website does contain a disclaimer:

> We welcome your email, but please understand that communications via email or through this website do not constitute or create an attorney–client relationship between you and [SBSB Eastham] or any of its attorneys. Unless we reach an agreement with regard to representation, the information you provide will not be treated as confidential and privileged, and any such information may be used adversely to you and for the benefit of current or future clients of the law firm.

SCHOEUST, BAMDAS, SOSHEA, BENMAIER & EASTHAM PLLC, https://sbsb-eastham.com/contact/ (last visited February 7, 2023). Notably missing is any indication that services provided does not constitute an attorney–client relationship.

U.S. Department of Justice, and (ii) various mechanical breakdown(s),"  and that, "[b]y reason of the foregoing, [PMI has placed Maersk] on notice of a claim(s) for damages . . . arising from, related to, or in connection with . . . the delay to the Cargo caused by the alleged violation(s) and/or breakdown(s) of the Vessel." Dkt. 1 at 3–4. Additionally, Maersk sought ex parte expedited discovery related to the "investigation conducted by the USCG and DOJ on the Vessel and related detention in Port Arthur in September/October 2022." Dkt. 1-3 at 2.

The discovery that SBSB Eastham sought on behalf of Maersk is undoubtedly information that it was privy to when Ms. Haas attended the investigation aboard the Vessel and through SBSB Eastham's correspondence with the Club, Winchester, and the Vessel's manager. Maersk's Motion for Expedited Discovery states that the documents it seeks "are focused on the delays and breakdowns of the vessel" and that Maersk "does not have access to the vessel, the crew or any documents." Dkt. 20 at 4–5. But SBSB Eastham certainly did/does. Maersk cannot urgently demand discovery that it has certified to this court is necessary to defending itself in this litigation and then turn around and argue that the fact that its current counsel was aboard the Vessel during the detention at issue—on behalf of the defendant that Maersk is suing—and had access to some or most of the requested discovery, is irrelevant and unrelated. This is a textbook example of "substantial relation."

Accordingly, I find that Winchester has established that the subject matter of the present litigation and SBSB Eastham's former representation of Winchester in connection with the Vessel's detention are substantially related. Because this finding gives rise to an *irrebuttable* presumption "that relevant confidential information was disclosed during the former period of representation," *Duncan*, 646 F.2d at 1028, I do not reach Winchester and Maersk's arguments regarding whether "the representation in reasonable probability will involve a violation of Rule 1.05 [concerning the unauthorized disclosure of confidential information]." TEX. DISC. R. PROF'L CONDUCT 1.09(a)(2).

### C. MOTION TO STRIKE PLEADINGS

Winchester requests "to strike all pleadings filed by [SBSB Eastham]." Dkt. 37 at 7. Tellingly, Winchester cites no case law whatsoever to substantiate such an extraordinary remedy on top of the already severe sanction that is disqualification. To be clear, I find the timeline of events and the vigor with which SBSB Eastham has disputed its attorney–client relationship with Winchester troubling. But there is simply no basis for striking all pleadings, and the fact that Winchester has not provided any legal support for this request demonstrates to me that it is not a serious one.

## CONCLUSION

In closing, I want to be clear that I am not announcing some extraordinary, sweeping new rule that will upset the admiralty bar. I am cognizant that the admiralty bar is small and that admiralty attorneys frequently find themselves taking positions adverse to former clients. This is entirely permissible under the professional rules. My ruling today has no effect on that status quo. Indeed, my ruling is exceedingly narrow:

> *As it concerns X (a law firm and local correspondent for a P&I Club) and Z (a P&I Club member to whom X is rendering its services), X may not:*
> - *tell Z that Z's communications with X are privileged;*
> - *represent and assist Z during the detention and investigation of its vessel, including having one of X's attorney's aboard Z's vessel during an inspection;*
> - *recommend and coordinate with criminal counsel for Z; and*
> - *bill Z for services rendered during the detention;*
>
> *and then, less than two months later, turn around and, without Z's consent, sue Z on behalf of a client for claims arising from the same detention and investigation of Z's vessel, including demanding expedited discovery of many of the documents, people, and facts that X had access to during the detention while operating on behalf of Z.*

This is not a burdensome rule that will upset the admiralty bar. It is a simple rule based on existing codes of professional conduct.

Because I find that (1) Winchester has established that SBSB Eastham had an attorney–client relationship with Winchester in connection with the Vessel's detention, and (2) that the Vessel's detention is substantially related this matter, Winchester's Motion to Disqualify (*see* Dkt. 37) is **GRANTED**. SBSB Eastham is disqualified from representing Maersk in this matter. To the extent that Winchester seeks to strike all pleadings submitted by Maersk's counsel, that request is **DENIED**. I note, however, that Maersk's Motion and Memorandum for Appointment for Service of Maritime Attachment and Garnishment ("Motion for Appointment") seeks "an Order appointing Kelly M. Haas." Dkt. 29 at 1. Ms. Haas is disqualified from representing Maersk in this matter. Therefore, Maersk's Motion for Appointment (*see* Dkt. 29) is **DENIED as moot**.

SIGNED this 8th day of February 2023.

_____
ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE