Case 3:22-cv-00390 Document 93 Filed on 03/27/23 in TXSD Page 1 of 16

United States District Court
Southern District of Texas
**ENTERED**
March 27, 2023
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | | |
|---|---|---|
| MAERSK TANKERS MR K/S, | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 3:22-cv-00390 |
| | § | |
| M/T SWIFT WINCHESTER, *in rem*, *et al.*, | § | |
| | § | |
| | § | |
| Defendants. | § | |

## OPINION AND ORDER

Pending before me is a Motion to Reduce Security filed by Defendant Winchester Shipping Inc. ("Winchester"). Dkt. 59. Plaintiff Maersk Tankers MR K/S ("Maersk") and Plaintiff-Intervenor P.M.I. Trading DAC ("PMI") both oppose the motion. On March 17, 2023, I held a hearing on the motion and afforded PMI the opportunity to submit supplemental briefing, which it did. *See* Dkt. 90. Having considered the motion, the briefing submitted by all parties, the record, and the applicable law, I grant the Motion to Reduce Security.[1]

## BACKGROUND

Winchester, as the owner of the M/T SWIFT WINCHESTER ("the Vessel"),[2] committed the Vessel to a commercial tanker trading pool known as the Maersk Tankers Pool Agreement (the "Pool Agreement"), for which Maersk serves as the

---

[1] This case has been referred to me for all pretrial matters. *See* Dkt. 36. A motion to reduce security is not within the enumerated list of dispositive matters that require me to issue a memorandum and recommendation. *See* 28 U.S.C. § 636(b)(1)(A). Nor will the outcome of this motion dispose of this case. Accordingly, this is a non-dispositive matter on which I may issue an order as opposed to a memorandum and recommendation. *See, e.g.*, *Int'l Ship Repair & Marine Servs., Inc. v. Barge B. 215*, 418 F. Supp. 3d 1051, 1053 (M.D. Fla. 2019) (magistrate judge deciding motions to vacate arrest and to set security and counter security by order); *Golden Horn Shipping Co. v. Volans Shipping Co.*, No. 14-cv-2168, 2016 WL 1574128, at *8 (S.D.N.Y. Apr. 15, 2016) (magistrate judge reducing security by order).

[2] Winchester has since sold the Vessel.

commercial manager. The Pool Agreement is governed by English law and requires that disputes be referred to London arbitration. The Pool Agreement also provides that Winchester will defend, indemnify, and hold harmless Maersk. On September 1, 2022, Maersk—through a Fixture Note with PMI that incorporates the PMI Trading DAC/Maersk Tankers 2019 terms (the "2019 terms") and 2021 Contract of Affreightment Agreement—chartered the Vessel to PMI under a charter party (the "PMI Charter") that called for the transport of clean petroleum products (the "Cargo") from Port Arthur, Texas to Tuxpan, Veracruz, Mexico in three days' time. The PMI Charter is governed by federal maritime law and, to the extent that federal maritime law is not applicable, the laws of the State of New York. Under the PMI Charter, disputes are to be referred to arbitration in New York. The 2019 terms provide for certain vessel warranties pertaining to both seaworthiness and compliance with applicable laws.

On September 7, 2022, the U.S. Coast Guard ("USCG") detained the Vessel in Port Arthur for alleged statutory and regulatory violations, including violations of the International Convention for the Prevention of Pollution from Ships ("MARPOL"). The USCG released the Vessel on September 15, 2022, but requested that U.S. Customs and Border Protection withhold departure clearance pending the posting of security satisfactory to the USCG. The USCG, Winchester, and the Vessel's technical manager, V.Ships Norway, engaged in a protracted, three week-long negotiation concerning security. The security agreement was finally signed on October 6, 2022, but due to a crew change, the Vessel did not depart Port Arthur until October 8, 2022.

The Vessel experienced engine failure during her outbound passage from Port Arthur and was delayed another day. The Vessel was cleared to sail again on October 9, 2022, but Maersk, on instruction from PMI, directed the Vessel to remain at Port Arthur Anchorage and await orders, and eventually to sail to the Galveston Offshore Lightering Area ("GOLA"). On October 16, 2022, the Vessel arrived at GOLA and tendered Notice of Readiness ("NOR") for cargo operations.

On October 18, 2022, however, the Vessel experienced further mechanical problems requiring repairs, and was not cleared again until November 1, 2022. The Vessel was delayed another day while it sailed out to sea to discharge its bilgewater tank. The Vessel returned to GOLA on November 2, 2022, and tendered NOR. On November 5, 2022, the Vessel commenced discharging the Cargo via a ship-to-ship ("STS") lightering operation. It is unclear from the affidavits submitted whether the Vessel completed discharging the Cargo on November 6 or 7. *Compare* Dkt. 59-1 at 4 ("PMI's cargo was subsequently transferred . . . on November 6."), *with* Dkt. 71-1 at 5 ("On November 7, 2022, the discharge of the Cargo was completed."). Regardless, the process of getting PMI's Cargo from Port Arthur to Tuxpan clearly took much longer than the three days called for in the charter party.[3]

On November 8, 2022, Maersk instituted this action by seizing the Vessel pursuant to Rule C of the Supplemental Rules for Admiralty or Maritime Claims. Maersk alleged that PMI had placed Maersk "on notice of a claim[] for damages in the approximate amount of $6,855,000.00," and that Winchester had breached its obligation to defend, indemnify, and hold harmless Maersk, per the terms of the Pool Agreement. Dkt. 1 at 3–4. The sole proof that Maersk offered of its claimed damages—which, really, are PMI's claimed damages—was an email from PMI to Maersk estimating its damages while the cargo was still pending delivery. *See* Dkt. 1-1 at 2. On November 9, 2022, with a sale of the Vessel imminently pending, Winchester moved this Court for an order approving substitute security and

---

[3] I have cobbled together these background facts from the Verified Complaints and sworn affidavits in the record. No party has freely offered *all* of these facts. For example, the affidavit of Winchester's President, Stefanos Kasselakis, focuses a great deal on the three-week delay caused by V.Ships Norway but devotes a mere paragraph to the events between October 8, 2022, and the completion of discharging the Cargo. *See* Dkt. 59-1. Similarly, the affidavit of Capt. Manu Kesavan, the Circle Lead for Commercial Operations at Maersk, focuses a great deal on the delays caused by the Vessel's mechanical failures but is silent as to why nothing happened between October 9, 2022, when the Vessel was cleared to sail, and October 16, 2022, when the Vessel arrived at GOLA and tendered NOR. *See* Dkt. 71-1. Nevertheless, as best I can tell and with the exception of the date that discharging the Cargo was completed, none of these facts are disputed.

requested to deposit $7,355,000.00 as security into the Court's registry. I approved the substitute security the following day, Winchester deposited the funds into the Court's registry, and the Vessel was released and sold.

On November 28, 2022, PMI filed an intervenor complaint and sought to attach the funds in the Court's registry pursuant to Rule B. PMI offered no evidence of its damages other than the same email that Maersk provided three weeks earlier:

> Good day,
>
> As per our below, we would like to advise due to owner breach to perform CP, we have estimated below expenses:
>
> Demurrage Seaways Grace
> Demurrage $210,000.00 approx
>
> Demurrage Valturchese
> 120,000.00 approx
>
> Loss due to not be able to perform STS BT SWIFT WINCHESTER market changes
> .
> $4,416,702.33 usd
>
> Loss due to rescheduled boats in order to avoid Mexican shortage, PMI normally loads naphtha on top in order to optimize profit, we were canceling all of them in order to minimize additional loses.
>
> | MT | Lost Profit |
> |---|---|
> | ARDMORE EXPLORER | 2,076 USD |
> | VELOS AQUARIUS | 590,269 USD |
> | MISS BENEDETTA | 746,436 USD |
> | **Total Lost Profit** | 1,338,780 USD |
>
> Roughly we estimated about 6 855 000 USD.

4

Dkt. 48-1 at 2. On December 7, 2022, Winchester filed the instant motion, arguing that "good cause exists to reduce PMI's claimed damages" because "[e]ach of the specific claimed damages aside from demurrage charges is wholly unrelated to the Vessel's charter," meaning that they are "unrecoverable consequential damages" for which "Winchester had no notice or knowledge." Dkt. 59 at 11. Additionally, Winchester created a chart showing that $769,516.67 of PMI's claimed damages is entirely unexplained:

| Category | Vessel | Amount |
|---|---|---|
| Demurrage | SEAWAYS GRACE | USD 210,000 |
| Demurrage | VALTURCHESE | USD 120,000 |
| Loss due to Market Changes | | USD 4,416,702.33 |
| Lost Profits relating to cancellation of another charter to avoid Mexican shortage (PMI normally loads naphtha on top to optimize profit; PMI cancelled charter) | ARDMORE EXPLORER | USD 2,076.00 |
| Lost Profits relating to cancellation of another charter to avoid Mexican shortage (PMI normally loads naphtha on top to optimize profit; PMI cancelled charter) | VELOS AQUARIUS | USD 590,269.00 |
| Lost Profits relating to cancellation of another charter to avoid Mexican shortage (PMI normally loads naphtha on top to optimize profit; PMI cancelled charter) | MISS BENEDETTA | USD 746,436.00 |
| Total Amount of Identified Claims: | | USD 6,085,483.33 |
| Plus unspecified claim | | USD 769,516.67 |
| Total PMI Claim Amount: | | USD 6,855,000 |

Dkt. 59 at 10.

In response, PMI and Maersk (collectively, "Plaintiffs") primarily advance two arguments. First, they argue that I either cannot or should not consider

Winchester's motion because Winchester and Maersk "agreed that an amount of $7,355,000 would be sufficient to stand as substitute security." Dkt. 8 at 1. Second, they argue that the security should not be reduced because questions regarding the foreseeability of consequential damages or the sufficiency of proof are questions better left for the arbitrators. I will address each argument in turn.

## LEGAL STANDARD

Admiralty Rule E(6) provides that "[w]henever security is taken the court may, on motion and hearing, for good cause shown, reduce the amount of security given." FED. R. CIV. P. SUPP. R. AMC E(6). The Fifth Circuit has yet to address the standard that a district court should follow when considering such a motion. *See Eitzen Bulk A/S v. Capex Indus., Ltd.*, No. 10-cv-395, 2010 WL 5141257, at *2 (E.D. La. Dec. 13, 2010). So, this court will follow the lead of district courts within the Fifth Circuit and look to the Second Circuit's landmark decision in *Transportes Navieros y Terrestres S.A. de C.V. v. Fairmount Heavy Transp., N.V.*, 572 F.3d 96 (2d Cir. 2009) (henceforth, *Fairmount*), for guidance. *See Llagas v. Sealift Holdings Inc.*, No. 2:17-CV-00472, 2020 WL 4434641, at *2 (W.D. La. July 31, 2020) (looking to *Fairmount* for the standard in reviewing a Rule E(6) motion to reduce security); *see also Eitzen Bulk A/S*, 2010 WL 5141257, at *2 (same). In *Fairmount*, the Second Circuit explained:

> [A] court may assess preliminarily the reasonableness of plaintiff's damages claim when setting a security under Rule E(5) and may weigh this and other equitable considerations when evaluating whether good cause exists to reduce a security under Rule E(6). In making a preliminary assessment of plaintiff's damages claim, the court should be satisfied that the plaintiff's claims are not frivolous, but it should not require the plaintiff to prove its damages with exactitude.

572 F.3d at 111. An admiralty court sitting in equity must be mindful of several competing considerations, as explained by one court in the Southern District of New York applying *Fairmount*:

> Under longstanding precedent and practical realities, the amount of security set by this Court will place an effective cap on recovery in these actions. . . . [T]his reality should guide the Court in

> consideration of these motions. . . . The Court is also mindful that there is a competing interest by a vessel owner to free up (and allow current use of) funds held that are beyond appropriate security. Maintaining a defendant's funds in a court registry—especially at a level set during the exigency of vessel arrest—can work a significant hardship. *See Transportes*, 572 F.3d at 108-09 ("Absent district court discretion to . . . reduce the security based on a weighing of the equities . . . it would work inestimable hardship on the defendant if a plaintiff could obtain an attachment for any amount it claimed in damages . . . ." (internal quotation marks omitted)). In exercising discretion to reduce security under Rule E(6), courts strive to strike this balance carefully and equitably.

*Ing Bank N.V. v. M/V Voge Fiesta*, No. 16-cv-2051, 2016 WL 8136300, at *2 (S.D.N.Y. Oct. 20, 2016). While a "court should not conduct a trial on the merits at this stage . . . still, *some* sort of inquiry into the merits is required to ensure that a defendant's funds are not attached arbitrarily." *Al Fatah Int'l Navigation Co. v. Shivsu Canadian Clear Waters Tech. (P) Ltd.*, 649 F. Supp. 2d 295, 298 (S.D.N.Y. 2009).

## ANALYSIS

**A. REVIEW OF WINCHESTER'S MOTION IS NOT FORECLOSED**

Before I consider whether the present amount of security fairly reflects Plaintiffs' likely recovery, I must deal with Plaintiffs' argument that the security should not be reduced because Winchester and Maersk stipulated to the amount of security. I am not enamored with this argument.[4] To start, there is nothing in the Admiralty Rules that forecloses review of a motion to reduce security simply because the parties initially stipulate to the amount of security. Nor does *Stemcor USA Inc. v. M/V CERN URKMEZ*, 2000 AMC 2104, 2000 WL 1763663 (S.D. Ala. 2000)—a case on which PMI heavily relies for this argument—stand for that proposition. The court in *Stemcor* declined to entertain the defendant's motion to reduce security "because the vessel was released on stipulation of the parties, not

---

[4] Nor am I enamored with Winchester's argument that it did not stipulate to the amount of security. It clearly did. The merit of that argument, however, is not determinative of whether I can review the instant motion.

by the giving of security." *Id.* at *1 (citing Rule E(5)). In other words, the court declined review because the vessel was released by private agreement, not by any order of the court. The same was true in the case on which the *Stemcor* court relied—*The Monarch*, 40 F. 283 (D.S.C. 1887). In *The Monarch*, the defendant executed a bond that "was not fixed by an officer of th[e] court, nor was it executed under the provisions of section 941 of the Revised Statutes; nor were the sureties approved by the collector of the port." *Id.* at 284. Contrary to Plaintiffs' argument here, the district court in *The Monarch* stated that "[h]ad the *stipulation* been executed under an order emanating from this court . . . I would feel no hesitation in looking into the amount demanded." *Id.* (emphasis added). Again, it was not the stipulation of the parties that prevented court review in either *Stemcor* or *The Monarch*. Rather, because the giving and taking of security in both cases was entirely extrajudicial, those courts declined to interfere in the parties' private agreement.

Here, we do not have a private, extrajudicial agreement. To the contrary, Winchester requested permission to deposit funds into this Court's registry as security. Maersk and Winchester's stipulation was "executed under an order emanating from this court." *The Monarch*, 30 F. at 284. It is of no moment that Winchester initially agreed to the amount demanded by Maersk. *See Whitney-Fidalgo Seafoods, Inc. v. Miss Tammy*, 542 F. Supp. 1302, 1304 (W.D. Wash. 1982) ("Although relevant to the instant issue, the fact that the amount of the bond was fixed by stipulation is not preclusive of this court's exercise of discretion."). To reach a contrary result would run afoul of the plain language of the Admiralty Rules, which explicitly permit parties to stipulate to the amount of security and then later move to reduce it. *Compare* FED. R. CIV. P. SUPP. R. AMC E(5)(a) (permitting the release of property "by stipulation of the parties, conditioned to answer the judgment of the court"), *with id.* R. E(6) (permitting, "for good cause shown," a court to "reduce the amount of security given"). Moreover, while the Admiralty Rules "eliminated some of the court's equitable

8

discretion, the court retain[s] considerable latitude to fashion an appropriate equitable remedy in each case."[5] *Am. Milling Co. v. Brennan Marine, Inc.*, 623 F.3d 1221, 1226 (8th Cir. 2010). For all these reasons, Winchester's initial stipulation to the amount of security does not foreclose my review of Winchester's motion to now reduce that security. Of course, that's the easy part. The hard question is whether the amount of security—$7,355,000.00—fairly reflects PMI's likely recovery in a New York arbitration applying federal maritime law and, to the extent not applicable, the law of the State of New York.[6]

### B. MOST OF PMI'S CLAIMED DAMAGES ARE PATENTLY FRIVOLOUS

At the outset, I want to acknowledge that PMI is not required to "prove its damages with exactitude." *Fairmount*, 572 F.3d at 111. But there is a spectrum between proving damages with exactitude and simply saying, for example, "You owe me banana damages: one million dollars," without any further explanation. On this continuum, certain of PMI's claims are—to borrow a phrase from the motion to dismiss standard—nothing "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S.

---

[5] Tellingly, Maersk's new counsel—its previous counsel having been disqualified (*see* Dkt. 79)—acknowledged as much at the hearing on Winchester's Motion to Reduce Security, declining to advance the plainly incorrect argument that Maersk and Winchester's stipulation forecloses review of the instant motion.

[6] Contrary to Maersk's argument, Winchester's allegations regarding the unforeseeability of PMI's claimed damages do not require contract interpretation under English law. *See* Dkt. 71 at 10. A quick refresher on the love triangle at play here: Maersk, as the commercial manager of the Vessel via the Pool Agreement, brings this action against Winchester for breach of contract for failing to defend, indemnify, and hold harmless Maersk from the claims that PMI has against Maersk. It is true that Maersk's agreement with Winchester is governed by English law and subject to London arbitration. But Maersk's agreement with PMI is governed by federal maritime law (and, where that law is silent, New York law) and is subject to New York arbitration. Accordingly, the only law that matters here is federal maritime law and, potentially, New York law. This is because Maersk has a claim against Winchester *only* to the extent that federal maritime and New York law support *PMI's claim* against Maersk. Maersk has not even instituted an arbitral proceeding in London against Winchester. And Maersk points me to no authority—I would be shocked if any exists—that stands for the proposition that English law would permit Maersk to recover *more* in direct damages (as opposed to things like interest, attorney fees, and costs) from Winchester than *PMI* can recover from Maersk.

9

662, 678 (2009). I'll start with the most obvious one: PMI's unspecified claim for $769,516.67.

### 1. PMI's Unspecified Claim

In its Motion to Reduce Security, Winchester clearly argued that "PMI asserts a[n] unspecified claim for USD 769,516.67 that lacks any explanation whatsoever." Dkt. 59 at 2; *see also id.* at 10 (listing $769,516.67 as an "unspecified claim"); *id.* at 11 (remarking, again, that "the unspecified sum of USD 769,516.67 lacks any explanation for the basis of that claim"). PMI did not address this argument in its response.[7] In its reply, Winchester repeated its assertion that "neither PMI nor Maersk has produced any evidence whatsoever for the unspecified claim amount of USD 769,516.67." Dkt. 73 at 10. PMI, again, did not address this argument in its sur-reply. At the hearing, I told the parties that, if nothing else, I believed the security should be reduced by at least $769,516.67 because PMI had failed to address the source of that unaccounted-for sum, despite having two opportunities to do so. PMI's counsel failed to provide an explanation at the hearing. So, I gave PMI a *fourth* and final opportunity to submit supplemental materials explaining the damages to which this sum should be attributed. Shockingly, PMI *still* offers no explanation whatsoever for this sum. Moreover, PMI is unabashed in its failure to give a basic accounting. *See* Dkt. 90 at 2 ("It is unknown at this time if PMI's preliminary calculation of damages of

---

[7] Maersk did not address this argument either, but I would not expect it to. Maersk is in an "unenviable situation." Dkt. 71 at 11. On the one hand, Maersk cannot (nor should it) concede the validity of PMI's claimed damages or make any arguments *supporting* those damages, because Maersk is presently *defending* itself against PMI in a New York arbitration. But, on the other hand, Maersk has a facially valid breach of contract claim against Winchester for failing to defend, indemnify, and hold harmless Maersk. Thus, Maersk, quite understandably, wants to ensure that it has sufficient security to cover whatever damages might be awarded to PMI in the New York arbitration, however poorly pled. Accordingly, I do not fault Maersk for arresting the Vessel and seeking security in an amount sufficient to cover PMI's "back-of-the-envelope calculation." Dkt. 73 at 7 n.9. But PMI—the party seeking to recover these damages in the first instance and the one best situated to explain and substantiate them—is now a party to this proceeding, and more is required to keep the current quantum of security in place.

$6.8 million was an adding error or simply took account of the additional losses and costs that PMI expected to incur."). But the height of PMI's hubris comes from the fact that, in its *unverified* supplemental filing, PMI simply ups the preliminary damages by $653,296.67 *without explanation. Compare* Dkt. 48-1 at 2 (specified damages total $6,085,483.33), *with* Dkt. 90 at 2 ("The revised preliminary claim totals $6,738,780."). The irony of PMI failing to account for the unspecified claim of $769,516.67 while upping its specified damages to an amount just shy of that is not lost on me. This is wholly insufficient for the reasons explained below.

### *2. PMI's Claim for Losses Due to Market Changes*

PMI asserts that it has suffered $4,416,702.33 in losses due to market changes. The only explanation that PMI offers for these losses is this statement from its attorney in fact, Victor Manuel García Bonilla:

> The losses that PMI has sustained are not based simply on a spot market price or simply by looking at a price index. Rather, PMI's losses are based on the commercial strategies were [sic] PMI hedge its position on the volume as soon as we knew that a STS will be performed. The hedge position was necessary as PMI was exposed to the market volatility and the continued use of the SWIFT WINCHESTER until the moment of STS occurred. The customer selling prices are agreed by a confidential long-term contract. These delays had a direct effect on the P&L of this strategy. Calculating the damages is underway, but it will take some time for this process to be completed.

Dkt. 70-1 at 4. This financial gobbledygook is a hand-wave that obscures a scarcity of substance. Again, PMI is not required to provide exacting proof of its claim for losses due to market changes,[8] but it has to give me *some* kind of detail or explanation. For example, if I assume that these were hedging losses and not merely part of a larger market position strategy, what exactly was PMI hedging

---

[8] I am purposefully not calling these claimed damages "hedging" losses. First, that is not what PMI called these damages in its own damages email. *See* Dkt. 48-1 at 2. Second, as Winchester points out in its reply to PMI's supplemental briefing, it's not clear whether these claimed losses are, in fact, hedging losses, or "merely part of a larger market position strategy." Dkt. 91 at 2 (quoting Dkt. 90-3).

against? Was it the price of gasoline or something else? PMI simply slapped a label—"Loss due to not be[ing] able to perform STS BT SWIFT WINCHESTER market changes" (Dkt. 48-1 at 2)—on a number and continues to maintain that even now, *months* after the fact, any further inquiry is "premature." Dkt. 70-1 at 5. That is just not enough.

I assume, *arguendo*, that all of the contracts at issue here permit consequential damages and that "time of the essence" is an implied provision of each of them. But PMI still has to show that its claimed damages were foreseeable *to Winchester* at the time the charterparty was executed. Alas, PMI cannot provide me with even one case suggesting that a *shipowner*—as opposed to "companies who are involved in the purchase and sale of oil products," *Vitol S.A., Inc. v. Koch Petroleum Grp., LP*, No. 01-cv-2184, 2005 WL 2105592, at *1 (S.D.N.Y. Aug. 31, 2005)—should foresee losses due to market changes, based on unspecified and confidential commercial strategies, from the delayed delivery of gasoline cargo. This is important because Winchester has provided a sworn affidavit from its President that Winchester "had no expectation of any impact on any other charter or cargo value based on market fluctuations." Dkt. 59-1 at 2. Neither PMI nor Maersk has provided me with contrary evidence. In the absence of *any* case law suggesting that such foreseeability is legally implied under these circumstances, I have no reason to think that PMI is likely to recover on this claim.

Again, I am not asking for a lot here. I just need *something*—anything, really—to indicate that these claims are not frivolous. It is not enough to make a conclusory allegation that a defendant should have foreseen a particular loss. If it were, then any plaintiff could demand any amount of consequential damages based on nothing more than the butterfly effect.[9] That is the exact abuse that this inquiry

---

[9] "The 'butterfly effect' is a theory of remote causation. Under this theory, present conditions are the result of a [string] of events set off by a seemingly inconsequential act. An example is the idea that a butterfly stirring the air today in China can transform storm systems next month in New York." *Aransas Project v. Shaw*, 775 F.3d 641, 657 n.10 (5th Cir. 2014).

is designed to guard against. *See Fairmount*, 572 F.3d at 109 ("Absent district court discretion to set a security based on a preliminary assessment of a plaintiff's claims or to reduce the security based on a weighing of the equities, there would be no mechanism to ensure that maritime plaintiffs do not abuse the attachment procedure by claiming damages that have no basis in reality."). Accordingly, the quantum of security should be reduced by $4,416, 702.33, which is the amount of damages that PMI attributes to "Loss due to not be[ing] able to perform STS BT SWIFT WINCHESTER market changes." Dkt. 48-1 at 2.

### 3. PMI's Lost Profits Claims

PMI alleges that it lost profits to the tune of $1,338,780.00 due to the Vessel's delay. The only explanation that PMI offers for these damages is this: "These lost profits are based on PMI's inability to optimize the value of the cargo on board these vessels by loading naphtha on top because they had to be diverted to Mexico to cover the October delivery window, given that the Swift Winchester was still at anchorage at [GOLA]." Dkt. 90 at 2. PMI does not allege that the Vessel was carrying the naphtha that PMI needed to load on top of these other vessels. Rather, it seems that PMI is claiming it did not have *time* to load naphtha on top of these vessels because they had to be dispatched to cover a gasoline shortage created by the Vessel's delay. Once again, I am faced with Winchester's uncontroverted evidence that it "had no expectation of any impact on any other charter or cargo value based on market fluctuations" (Dkt. 59-1 at 2), and no case law to suggest otherwise. On a theoretical level, I struggle to understand why the Vessel's delay meant that PMI could not "optimize the value of cargo on board" *other* vessels. Again, I don't need much, but I do need some kind of explanation as to why these lost profits should have been foreseeable to Winchester at the time the charter party was executed. Yet, I have nothing. Without more, I cannot say that PMI has any chance of recovering damages for these lost profits claims.

13

### *4. PMI's Demurrage Claim*

"Demurrage is a penalty imposed on a charterer of a vessel for delays in loading or unloading the ship's cargo." *Victory Shipping Pte. Ltd. v. 50,109 Metric Tons of Cement*, No. 4:22-CV-03689, 2022 WL 17738735, at *1 n.2 (S.D. Tex. Dec. 16, 2022) (quotation omitted). PMI claims that it incurred approximately $210,000.00 in demurrage for the SEAWAYS GRACE, *see* Dkt. 48-1 at 2, the first ship that it selected for an STS lightering operation. *See* Dkt. 71-1 at 4. I presume this demurrage is for a delay in *loading* the SEAWAYS GRACE, but I have no way of knowing because, again, PMI has simply given a number a label and provided no further explanation. PMI also claims that it incurred approximately $120,000.00 in demurrage for the VALTURCHESE, the ship to which the Vessel ultimately transferred PMI's Cargo. *See id.* Again, I presume this demurrage is for a delay in *loading* the VALTURCHESE but, having no other information about this claim, I can only presume.

I must admit that I am concerned that PMI's demurrage claim suffers from the same problems as its other damage claims. When parties initially move for Rule B attachment where demurrage is part of their damages, they typically provide, at a minimum, the name of the vessel and the dates for which demurrage is claimed, and they almost always attach a receipt or provide an accounting.[10] But PMI simply screams "demurrage" and slaps a total $330,000.00 figure as its damages without any explanation or discussion. Nevertheless, this is an equitable issue before me, and I possess great latitude in deciding whether to reduce the security. Given that

---

[10] *See, e.g.*, Plaintiff's Original Verified Complaint at 8 n.2, *Victory Shipping Ptd. Ltd. v. 50,109 Metric Tons of Cement, et al.*, No. 4:22-cv-3689 (S.D. Tex. Oct. 25, 2022), ECF No. 1 ("Under the [charter party], Texcem had 5.567 days to discharge and took 63.124 days. Pursuant to the Fixture, demurrage accrues at a rate of $36,000 per day – 57.556 days at $36,000 per day = $2,072,025.00. *See* Exhibit A at 7 § 12. The Fixture also provides that 'once on demurrage, always on demurrage' meaning that once Texcem has exhausted its laytime, the demurrage will begin to accrue and continue to accrue without interruption. *Id.* at 8 § 30.").

Winchester did not contest these claims in its Motion to Reduce Security,[11] and it is very likely that PMI incurred demurrage, I will not reduce, at this time, the $330,000.00 in alleged demurrage damages.

### 5. *PMI's Freight Claim*

In its *unverified* supplemental brief, PMI states that it "intends to claim for the freight it paid for the unperformed voyage of the Swift Winchester totaling $332,500." Dkt. 90 at 2. "Rule B(l)(a), pursuant to which [PMI]'s attachment is sought, provides that 'a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible property-*up to the amount sued for*." *Naftaservice Trading (Cyprus) Ltd. v. Alaric Co.*, No. 08-cv-0317, 2008 WL 152761, at *2 (S.D.N.Y. Jan. 16, 2008). If PMI wanted to attach $332,500.00 for freight, then it should have sued for that amount in the first instance or filed an amended verified complaint.

## CONCLUSION

For all these reasons, I find that Winchester's Motion to Reduce Security (Dkt. 59) should be **GRANTED**. In granting Winchester's motion, I want to be clear that I have not overlooked Winchester's "actions that led to the extensive detention of the vessel and delay in PMI being able to deliver its cargo." Dkt. 90 at 2. I am well aware of the "very serious MARPOL investigation undertaken by the USCG and DOJ," and the fact that "Winchester is an SVP (single vessel purpose company) meaning that the company has no assets other than the vessel," which it has since sold. Dkt. 20 at 2–3. But Winchester's actions and the risk that Maersk will be left holding the bag for some nebulous sum do not, on their own, transform whatever quantum of security PMI demands into a reasonable damages claim. I made it very clear at the hearing that PMI still has an obligation to show that its

---

[11] In its reply to PMI's supplemental brief, however, Winchester argues that "PMI has produced no evidence to support . . . any demurrage charges" and therefore, "PMI's claims of all categories remain unsupported and frivolous and, based upon the absence of any competent evidence on damages presently in the record, the Court should release the full amount of security previously posted by Winchester." Dkt. 91 at 3–4.

claims are not frivolous. I gave PMI an opportunity to provide some kind of substantiation, but PMI did not do so. Including its initial motion for attachment, PMI has had five bites at this apple, and I still have nothing more to work with than numbers with labels. For this reason, I grant Winchester's motion.

Accordingly, it is:

**ORDERED** that the amount of security posted by Winchester be reduced to the sum of $330,000.00.

**ORDERED** that the Clerk of the Court shall promptly disburse all such funds in excess of $330,000.00 (inclusive of accrued interest) held in the Court Registry Investment System ("CRIS") in connection with this action to Defendant Winchester Shipping, Inc., care of its attorneys, Blank Rome LLP. To be clear, following the disbursement of funds, only the sum of $330,000.00 should remain in the CRIS, and that sum shall remain until further order of the Court.

SIGNED this 27th day of March 2023.

_____
ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE